FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 03 MAY 20 PM 1: 36
MIDDLE DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| RALPH ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 02-PT-1027-M |
| | ) | |
| CITY OF GADSDEN, and | ) | |
| DAVID THOMPSON and PAUL CODY, | ) | |
| in their individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTERED**

**MAY 20 2003**

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant Paul Cody's ("Cody") Motion for

Summary Judgment (Doc. 16), filed on January 28, 2003, defendant City of Gadsden's ("the

City") Motion for Summary Judgment (Doc. 18), filed on January 31, 2003, and defendant David

Thompson's ("Thompson") Motion for Summary Judgment (Doc. 34), filed on April 8, 2003.

## FACTS AND PROCEDURAL HISTORY

Thompson is a police office with the Gadsden Police Department.  On or around April

25, 2000, Thompson was dispatched to the residence of plaintiff Ralph Anderson ("Anderson"),

having been informed that there was a dispute between neighbors and that a dog or animal was

involved in the dispute.  *See* Thompson Ex. 1 at 21-23.[1]  Thompson was not given the name of

any of the neighbors or the complaining caller.  *Id.* at 25.  Thompson answered the call alone.

*Id.* at 26.

After Thompson arrived at the residence, he knocked on the door.  At first, no one

_____

[1]Exhibits filed by Thompson and the City will be referred to as "Thompson Ex.," while exhibits filed by Paul Cody
will be referred to as "Cody Ex."

37

answered. However, after several attempts he heard a female voice inside asking "Who is it?" *See* Thompson Ex. 1 at 26. Thompson then saw Anderson walking in his direction from around the far side of a van that was located in the driveway. *Id.* at 27. At first, Thompson could only see the upper half of Anderson through the van's windows. *Id.* Thompson moved off the front porch and towards Anderson, asking "What's going on?" *Id.* at 28. According to Thompson, Anderson continued around the van walking toward him and responded "I'm fixing to put a cap in somebody's ass. That's what is going to happen." *Id.* Anderson denies making this statement. At this point, Thompson saw a "Blue Steel" revolver in Anderson's right hand, down by his side. Thompson told Anderson to put the gun down. *Id.* Anderson responded that he was not going to put the gun down, and repeated the statement when again told by Thompson to put his gun down. *Id.* at 29. Thompson asserts that Anderson walked past him and toward his house on the front sidewalk. Thompson believes, but is not certain, that he told Anderson to drop the gun and that he was under arrest as Anderson moved toward the front door. *Id.* at 31.

Anderson testified that the first thing that Thompson said to him was "Where is the gun?" *See* Thompson Ex. 3 at 68-69. Anderson asserts that he told Thompson that he was going to put the gun up. *Id.* at 69. At this point, the men were approximately five feet from each other. *Id.* at 68. Thompson did not have his weapon drawn at this time. *Id.* Anderson also testified that as he approached the house, he heard Thompson tell him to "drop the gun." *Id.* at 90. Anderson testified that he again told Thompson that he was going to put the gun away, thinking that he should put the gun in the house instead of putting it on the porch. *Id.* at 90-91. Anderson stated that at this point Thompson told him that he needed to turn around, because Thompson was going to shoot. *Id.* at 91-92. Anderson contends that during this exchange, as he was walking

2

toward the house, he mentioned to Thompson that he was a "reserve deputy sheriff." *Id.* at 94. Anderson agreed that the first time he saw Thompson with his gun drawn was when Anderson was at the front door. *Id.* at 100.

Thompson asserts that after Anderson refused to drop the gun and continued to walk toward the front door, he took a position at the corner of the van, and believes that it was at this point that he told Anderson to drop the gun or he was under arrest. *See* Thompson Ex. 1 at 31. Thompson also testified that, at this point, he did not know that Anderson lived in the house, did not know Anderson's name, and thought that perhaps the reason no one opened the door when he knocked was because Anderson was outside with a gun. *Id.* at 32. Also at this point, Anderson was walking toward the house, with a gun in hand and with a person inside the house, after having refused Thompson's order to put the gun down. *Id.* Before going into the house, Anderson again turned to Thompson and stated that he would not drop the gun. *Id.* at 33.

According to Thompson, Anderson then briefly went inside the home and came back outside. *See* Thompson Ex. 1 at 34. Thompson placed Anderson against the van and told him he was under arrest. *Id.* Thompson testified that his primary concern was to get Anderson under control and make sure that he did not have a weapon on him. *Id.* Thompson stated that he felt that the neighborhood was at risk because, if Anderson had raised the gun a little bit, Thompson may have felt compelled to fire. *Id.* at 35. If Anderson had returned fire, it would have resulted in a shoot-out, putting the neighborhood in jeopardy *Id.* Thompson stated that until he arrested Anderson, he did not know that Anderson lived there, why he went into the house, or if he was still armed. *Id.* at 33-36. According to Thompson, he was not given much detail about the incident while en route, and his immediate perception upon arrival was that there was a man in

3

the yard brandishing a weapon. *Id.* at 41-42.

Anderson tells a slightly different story. Anderson notes that on April 25, 2000, he was a reserve deputy with the Etowah County Sheriff's Department, and as such was licensed to own and carry a personally owned handgun. *See* Thompson Ex. 3 at 25-28. According to Anderson, on the day in question, he was in his yard mowing the lawn, when a dog came at him growling and with its teeth showing. *Id.* at 48-49. Anderson told his wife to call animal control, and he eventually went inside his home to get his gun for his own protection. *Id.* at 49. By the time he returned, the dog had gone. *Id.* At that point, Anderson's wife yelled to him that there was a police car out in front of the house, so Anderson walked around to see what was going on. *Id.*

As Anderson came around the house, he had the gun to his side. *See* Thompson Ex. 3 at 50-51. Anderson agrees that Thompson asked where the gun was, but Anderson asserts that he told Thompson that the gun was in his hand, that he was a reserve deputy, and that he was going to put the gun up. *Id.* at 50-51, 96. Anderson asserts that he walked toward his house, and as he got to the front, Thompson yelled at him "Turn around. I'm going to shoot you." *Id.* at 50-51. Anderson looked over his shoulder and saw Thompson's gun pointed at him. *Id.* Anderson testified that he felt like if he had turned around, he would have been shot. *Id.* Anderson went into the house and put the gun up, but when he returned outside Thompson grabbed him and threw him against the van with his gun still on Anderson. *Id.* at 51-52, 96. Anderson asserts that he told Thompson to be easy with his arm because he has just had surgery; however, Thompson grabbed the arm that much harder. *Id.* at 51-52. Thompson then put handcuffs on Anderson that were so tight that they cut into his skin. *Id.*

At this point, Anderson asked Thompson what he was charged with. *See* Thompson Ex.

4

3 at 52. Thompson refused to tell Anderson the charges. *Id.* Thompson then searched Anderson, and when he came to Anderson's leg, hit him below the belt. *Id.* Thompson then allegedly carried Anderson to the back of the police car, and slammed his head into the patrol car. *Id.* Thompson then grabbed Anderson and threw him into the back of the police car. *Id.* Anderson's wife came outside and asked what was wrong, stating that Anderson had not done anything. *Id.* at 77-78. Thompson responded that she should "get her ass back in the house or he would put her in jail." *Id.* Anderson continued to ask what he was charged with, but Thompson refused to reply. *Id.* at 52. Anderson also asked Thompson to identify the shift captain, at which point Thompson, laughing, asked the other officers who had arrived on the scene "Which one of ya'll want to be shift captain today?" *Id.* at 53.[2]

One of the officers that had arrived on the scene was defendant Paul Cody ("Cody"). When Cody initially arrived, he assisted the other officers in clearing the scene. *See* Cody Ex. 2 at 27. As Thompson was leaving the scene with Anderson, he radioed back and asked "could one of ya'll see if you could retrieve that weapon?" *Id.* at 27. Thompson related that the weapon was inside the house. *See* Cody Ex. 1 (audio tapes). Cody and Officer Mark Harris ("Harris") returned to the scene. *See* Cody Ex. 2 at 28. Cody and Harris rang the doorbell and Mrs. Anderson opened the main door. *See* Cody Ex. 3 at 48-49. Cody asked Mrs. Anderson about the gun and informed her that they needed to retrieve it. *Id.* at 49. Mrs. Anderson unlocked the screen door, opened it, and stepped back. *Id.* at 49-50. Anderson's gun was sitting on an antique desk that is located "right there at the door." *Id.* at 50-51. Cody retrieved the gun and left the premises. *Id.* at 51; Cody Ex. 2 at 29. At no time did Cody or Harris search the Anderson home

---

[2]To corroborate his version of the facts, Anderson points to the deposition of his wife and the declaration of his neighbor, James Richardson. *See* Thompson Ex. 4; Pl. Ex. 5; Pl. Br. at 5-6.

or open drawers or any other containers. *See* Cody Ex. 3 at 51; *see also* Cody Ex. 2 at 33-34 (Cody describing the situation).[3] According to Cody, the weapon was logged into evidence by either himself or Thompson. *See* Cody Ex. 2 at 30. Anderson was given back his weapon prior to his last court appearance. *See* Cody Ex. 4 at 157.

Anderson contends that all the way to the police station, Thompson called Anderson a "crazy son of a bitch." *See* Thompson Ex. 3 at 53. When they arrived at the police station, Thompson again slammed Anderson against the police car, and also slammed him against a wall. *Id.* at 53-54. Later that evening, Anderson's sister and brother-in-law posted bond and Anderson was released. *Id.* at 108-12. It was at that point that Anderson learned that Thompson had charged him with disorderly conduct and resisting arrest. *See* Pl. Ex. 3. Cody asserts that he had nothing to do with Anderson's arrest or charging. *See* Cody Ex. 2 at 23. The next day, Anderson notified the City of Gadsden of the actions taken by the officers and the nature of his claims against the City. *See* Pl. Ex. 4.[4]

Anderson's charges were to be tried in the Gadsden Municipal Court. However, according to Anderson, every time the case was to be tried "they couldn't find Officer Thompson." *See* Thompson Ex. 3 at 102-03. Anderson stipulated to the *prima facie* case in Municipal Court and immediately appealed to the Circuit Court, allegedly so that he could compel Thompson to appear. *See* Thompson Ex. 3 at 102-03; Pl. Ex. 7; Thompson Exs. 5-6. After a dismissal and reinstatement of the charges, the case eventually went to trial. After

---

[3]Mrs. Anderson testified that, given what had already happened, she felt compelled to open her home to the officers. *See* Thompson Ex. 4 at 54-55.

[4]Anderson notes that in the City's response to his notice of claim, it stated that "Mr. Anderson did not resist verbally or physically." *See* Pl. Ex. 6.

6

hearing the evidence, the Circuit Judge found in favor of Anderson and dismissed the case. *See* Pl. Ex. 8; Thompson Exs. 7-8.

Anderson filed this complaint on April 25, 2002. In Count I, Anderson alleges various violations of the Fourth Amendment. He alleges that Thompson and Cody wrongfully searched him; wrongfully pointed a pistol at him and threatened to shoot him, wrongfully handcuffed, arrested, and detained him; and wrongfully invaded his premises and took his pistol. *See* Compl; Pretrial Order at 3. In Count II, he alleges invasion of privacy against Thompson and Cody. *Id.* In Count III, he alleges the tort of negligent training and/or supervision against the City. *Id.* In Count IV, he alleges malicious prosecution against all of the defendants. *Id.* Defendants now seek summary judgment as to all claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence

'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Motions filed by Thompson and the City

#### A. Fourth Amendment Claims

##### 1. Defendants' Position

First, Thompson argues, the evidence clearly shows that he did not seize Anderson's pistol or invade his premises. Second, the only "search" was done incident to Anderson's arrest, and so if the arrest is valid, then the search would also be valid. Likewise, Thompson argues, the actions of his pointing the pistol at Anderson and threatening to shoot him are part and parcel to the discussion regarding the wrongful handcuffing, arrest, and detention. Thus, Thompson contends, the wrongful arrest claim is the linchpin of all of Anderson's Fourth Amendment

8

claims.

As to the wrongful arrest claim, Thompson notes that Anderson admitted that Thompson told him to drop the gun, and that he did not do so. The refusal to obey this command, Thompson argues, gave him cause to believe that Anderson was recklessly creating a risk of public inconvenience, annoyance, or alarm, and was engaging in threatening behavior. *See* Ala. Code § 13A-11-7 (defining disorderly conduct). Thompson also notes that Anderson stipulated to the *prima facie* case in municipal court, which is *prima facie* evidence that probable cause existed for instituting the prosecution. *See Delchamps, Inc. v. Larry*, 613 So. 2d 1235 (Ala. 1992); *Brown v. Parnell*, 386 So. 2d 1137 (Ala. 1980). The Circuit Court also found that the City had made a *prima facie* showing. *See* Thompson Ex. 7. Anderson has simply not rebutted Thompson's *prima facie* evidence that he had probable cause to arrest Anderson.

Thompson also argues that he is entitled to qualified immunity for the wrongful arrest claim, because he reasonably believed that he had probable cause to arrest Anderson. Thompson contends that the issue is "whether a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997) (citations omitted). Thompson notes that while their accounts may differ on certain details, both he and Anderson agree that Anderson had a weapon, that Anderson did not drop it when commanded to, and that Thompson was called to the scene to deal with a dispute. Under these facts, Thompson asserts, he is entitled to qualified immunity on the arrest, and the related actions such as handcuffing Anderson and brandishing his weapon.

   2. Plaintiff's Response

9

Anderson cites *Evans v. Hightower*, 117 F.3d 1318 (11th Cir. 1997), as standing for the proposition that the Fourth Amendment protects a person's right to walk away from a police officer. He also cites *Sheth v. Webster*, 145 F.3d 1231 (11th Cir. 1998), as an example of a case in which a Fourth Amendment violation was found when the officer had no probable cause to place the plaintiff under arrest. Next, Anderson cites *Livingston v. Browder*, 285 So. 2d 923, 927 (Ala. Civ. App. 1973), in which the court stated that an officer "is without privilege to use more force than is necessary to accomplish the arrest." Finally, Anderson notes, the Fourth Amendment requires weighing all of the circumstances surrounding the arrest, such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Conner*, 490 U.S. 386, 396 (1989). According to Anderson, the officer's intent is irrelevant. *Id.* at 398-99.

Applying these principles to the issue of qualified immunity, Anderson concedes that an arrest does not violate the Fourth Amendment if an officer has probable cause for the arrest. *See Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996). However, Anderson notes, probable cause exists when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)(citations omitted)(emphasis added). According to Anderson, the facts simply do not support a finding that Thompson had probable cause to arrest him for disorderly conduct or resisting arrest. *See* Ala. Code § 13A-11-7 (disorderly conduct); Ala. Code § 13A-10-41 (resisting arrest). Anderson notes that his wife

10

called the police in the first place to report the dog, that when Thompson arrived Anderson had

his gun pointed down, that Anderson told Thompson that he was going inside to put the gun

away, and that Anderson voluntarily returned outside to talk with Thompson.  Anderson also

notes that the criminal case against him was dropped.  Thompson simply had no reasonable basis

to believe that Anderson violated either of the statutes at issue.

Anderson cites *Thornton v. City of Macon*, 132 F.3d 1395 (11th Cir. 1998), arguing that

the case had facts similar to those here, which would have put Thompson on notice that his

conduct violated the Fourth Amendment.  In *Thornton*, police were called to settle a civil dispute

between Thornton and his girlfriend.  There was no indication that a crime had been committed.

When Thornton asked the officers to leave, they refused.  Ultimately, they tricked Thornton into

opening his door, at which point they grabbed him around the neck, threw him to the floor, and

handcuffed him.  The court found for Thornton, reasoning that

> Officer Coleman was dispatched to Mullis' house to address a civil dispute, and
> had "the general duty"--and the authority--"to enforce the law and maintain the
> peace." *Duncan v. State*, 163 Ga. App. 148, 148, 294 S.E.2d 365, 366 (Ga.
> App.1982).  Coleman's and the other officers' actions here far exceeded that
> authority.  Coleman lawfully could peaceably approach the front door of
> Thornton's apartment and attempt to deliver the keys and retrieve the mattress; in
> so doing he would merely be attempting to mediate and defuse a contentious
> situation.  He and the other officers could not force Thornton to make such an
> exchange, however, and they could not remain on Thornton's property after
> Thornton had refused to make the exchange.  Thornton had committed no crime
> and had not threatened anyone; once he had asked the officers to leave, their
> continued presence--and their attempt to retrieve Mullis' mattress by force--was
> not pursuant to their official duties and was outside of their authority.  After that
> point, they were no longer maintaining the peace; they were instead merely
> attempting forcibly to resolve a civil dispute.  No reasonable police officer would
> have believed that the officers had probable cause to arrest Thornton for
> "obstruction" of such unauthorized actions.

*Id.* at 1399 (applying Georgia law).  *See also* Pl. Br. at 13-16

*Thornton* also addressed the excessive use of force.  The court noted that "the officers were not justified in using *any* force, and a reasonable officer thus would have recognized that the force used was excessive." *Thornton*, 132 F.3d at 1400 (emphasis in original).  Anderson also cites *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997), arguing that it demonstrates that Thompson knew or should have known that he used excessive force under the Fourth Amendment in arresting Anderson.  In *Smith*, an officer entered Smith's mother's yard.  Upon seeing the officer, Smith picked up a baseball bat and raised it in a threatening posture.  The officer drew his gun and ordered Smith to drop the bat.  Smith did, and ran.  The officer eventually caught Smith, and while trying to put on the handcuffs, pulled Smith's arm behind his back so hard that it broke his arm.  The court allowed Smith's lawsuit against the officer to go trial, reasoning that

> The hazy border between permissible and forbidden force is marked by a multifactored, case-by-case balancing test.  The test requires weighing of all the circumstances, such as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  In this inquiry, the officer's intent, whether evil or good, is irrelevant.
>
> The grunt and the blow that Smith asserts that he heard and felt while Mattox was on Smith's back, coupled with the severity of Smith's injury, push this case over the line.  The three factors otherwise do not clearly point to a constitutional violation from Mattox's use of some force.  While the crime at issue may have been unknown and unclear to Mattox, thus placing this factor in Smith's column, the other two factors are in Mattox's column: after facing Smith with an upraised baseball bat, Mattox could reasonably have supposed that Smith presented some sort of danger to others' safety, especially to that of other officers participating in the sting operation on that street that evening.  Furthermore, even if Smith was not actively resisting arrest at the very moment the force was applied, he was before that moment; Mattox could reasonably have believed that without some force restraining Smith, he would have resumed either his attacks or his flight.  Thus, it was not unreasonable for Mattox to think that he was entitled to use some force to put Smith into cuffing posture.  But, assuming as we must that Smith was offering no resistance *at all*, the considerable effort and force

12

> inferable from the grunt, Smith's sensation of a blow, and the broken arm was
> obviously unnecessary to restrain even a previously fractious arrestee. We thus
> conclude that this case falls within the slender category of cases in which the
> unlawfulness of the conduct is readily apparent even without clarifying caselaw

*Id.* at 1419-20 (citations and footnotes omitted)(emphasis in original). *See also* Pl. Br. at 16-18.

Here, Thompson grabbed Anderson by the neck, slammed him against the police car and several

walls, struck him below the belt, and refused to loosen the handcuffs. All of these actions,

Anderson notes, were taken after Anderson has put the gun in the house and returned outside to

talk with Thompson. There was no threat to public safety, nor was there a risk that Anderson

might flee. Thus, Anderson argues, Thompson acts were clearly excessive, and he is not entitled

to immunity.

### 3. Defendants' Reply

Thompson asserts that neither the complaint nor the pretrial order contain an excessive

force claim. Rather, all of Anderson's Fourth Amendment claims involve false and/or unlawful

arrest and malicious prosecution. Thompson also again notes that Anderson was convicted in

the municipal court, and that the Circuit Court of Etowah County found that there was probable

cause for the arrest.

### B. Invasion of Privacy

### 1. Defendants' Position

Thompson notes that under Alabama law, there are four varieties of invasion of privacy:

(1) wrongful intrusion on the solitude or seclusion of another or his private affairs or concerns,

(2) publicity which violates the ordinary decencies, (3) putting the plaintiff in a false, though not

necessarily defamatory, light, and (4) the appropriation of some element of the plaintiff's

personality for a commercial use. *See Hogin v. Cottingham*, 533 So. 2d 525 (Ala. 1988).

Thompson argues that the facts as alleged clearly do not meet any of these definitions. The only physical entry was made by Cody, and it was with the consent of Mrs. Anderson. Thompson argues that there is no evidence of seclusion or any of the other hallmarks of a wrongful intrusion or other privacy claim. *See* Restatement (Second) of Torts § 652B (1977).

Thompson also argues that to the extent the invasion of privacy claims are based upon a theory of negligence, it is clear that Thompson's actions were discretionary duties performed within the line and scope of his ordinary duties. *See City of Birmingham v. Sutherland*, 834 So. 2d 755 (Ala. 2002); *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000).

2. Plaintiff's Response

Anderson cites *K-mart Corp. v. Weston*, 530 So. 2d 736 (Ala. 1988), in which the court stated that

> [The right of privacy] has been defined "as the right of a person to be free from unwarranted publicity," or "the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities."

*Id.* at 739 (emphasis added) (citations omitted). Anderson contends that the actions of Thompson constituted a wrongful intrusion into his private activities, causing him mental suffering, shame, and/or humiliation.

3. Defendants' Reply

In reply, Thompson argues that Anderson has submitted no evidence that would support his argument that the officers or the City committed the tort of invasion of privacy.

C. Negligent Training/Supervision

1. Defendants' Position

14

The City argues that Anderson has produced no evidence to show that it has failed to train Thompson or Cody, or otherwise failed to supervise them in any way which could have caused this incident to occur. The City also notes that Thompson testified that he had been certified in 1989 by the Northeast Alabama Police Academy, and that he had received training in community-oriented policing. *See* Thompson Ex. 1 at 8, 18.

2. Plaintiff's Response

Anderson does not specifically address this claim in his brief.

D. Malicious Prosecution

1. Defendants' Position

First, the City argues, Alabama law is clear that a claim for malicious prosecution cannot lie against a municipality. *See Brooks v. City of Birmingham*, 584 So. 2d 451 (Ala. 1991); *Nabors v. City of Birmingham*, 384 So. 2d 113 (Ala. 1980). As to Thompson, he argues that, as noted above, the Alabama cases have established that a presumption of probable cause is established by a conviction in municipal court, unless rebutted by competent evidence which clearly overcomes the presumption. *See Delchamps, Inc.*, 613 So. 2d 1235; *Brown*, 386 So. 2d 1137. Moreover, the evidence shows that Anderson did not put down the gun when told to do so, and although Anderson may have thought his actions were legitimate, Thompson had probable cause to believe that he was committing the offense of disorderly conduct. Thompson also contends that he is protected by discretionary function immunity. *See* Ala. Code § 6-5-338. Anderson has simply failed to present any evidence tending to prove that Thompson acted with bad faith or in a willful or malicious manner. *See Sutherland*, 834 So. 2d 755.

2. Plaintiff's Response

15

Anderson cites from *Whiting v. Traylor*, 85 F.3d 581 (11th Cir. 1996), in which the court

stated that

> [W]here a section 1983 plaintiff is seized following the institution of a
> prosecution . . . and he seeks to recover damages for all the elements of the
> prosecution, he can properly wait until the prosecution terminates in his favor to
> bring his section 1983 claim which alleges that the seizure was unreasonable. . . .
>
> . . . When the seizure is part of the institution of a prosecution (that is,
> when the Fourth Amendment violation is of the kind making a section 1983 claim
> based on the violation analogous to the tort of malicious prosecution), the plaintiff
> may properly wait to sue until the prosecution terminates in his favor. And, also
> under analogous malicious prosecution principles, injuries caused by the unlawful
> seizure may include those associated with the prosecution.

*Id.* at 585-86 (emphasis added).  Under Alabama law, Anderson contends, he must show that the

defendants instituted the criminal proceedings maliciously and without probable cause, and that

the proceedings were terminated in his favor. *See* Ala. Pattern Jury Instruction 24.02.  Anderson

contends that malice may be presented by showing the defendants' intent to do injury, or by

showing circumstances that imply such an evil intent.  He also cites Alabama Pattern Jury

Instruction 24.04, which states that malice "may be inferred by the reckless institution of a

criminal prosecution without information leading to a bona-fide belief that the person charged

was guilty as claimed."  Anderson contends that the facts as alleged above create a genuine issue

that should survive summary judgment.

## II. Motion filed by Cody

Cody argues that the Fourth Amendment claims against him, based upon his entering

Anderson's home and retrieving the weapon, should be dismissed because he is entitled to

qualified immunity.  Cody cites *Wilson v. Strong*, 156 F.3d 1131 (11th Cir. 1998), in which the

court stated that

16

> Qualified immunity shields a § 1983 defendant from liability for harms arising
> from her discretionary acts, so long as her acts do not violate any clearly
> established statutory or constitutional rights of which a reasonable person would
> have known.  To be clearly established, the contours of an asserted constitutional
> right "must be sufficiently clear that a reasonable official would understand that
> what he is doing violates that right."  "[I]n the light of pre-existing law, the
> unlawfulness must be apparent."

*Id.* at 1134 (citations omitted).  Cody argues that under the circumstances, any reasonable officer

would have concluded that he was provided consent to enter into the home.  *See* Cody Ex. 3 at

49-50; Ex. 2 at 33-34; Cody Br. at 7-9.  Moreover, the weapon was in plain view once Cody

entered the home.  *Id.* at 50-51.  There is no evidence that Cody searched Anderson's home or

opened any drawers or containers.  Cody did not act in a hostile or threatening manner and never

unholstered his weapon.  It cannot be said that his action were "so obviously wrong . . . that only

a plainly incompetent officer or one who was knowingly violating the law would have done such

a thing."  *Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994).  Thus, Cody argues,

he is entitled to summary judgment on the Fourth Amendment claims.

As to the claim of invasion of privacy, Cody argues, Anderson must first overcome

Cody's discretionary function immunity.  Cody cites Ala. Code § 6-5-338(a), which provides, in

part, that

> Every peace officer, except constables, who is employed or appointed pursuant to
> the Constitution or statutes of this state, whether appointed or employed as such
> peace officer by the state or a county or municipality thereof, . . . shall at all times
> be deemed to be officers of this state, and as such shall have immunity from tort
> liability arising out of his or her conduct in performance of any discretionary
> function within the line and scope of his or her law enforcement duties.

Alabama courts have held that discretionary acts are those for which "there is no hard and fast

rule as to course of conduct that one must or must not take and those requiring exercise in

judgment and choice and [involving] what is just and proper under the circumstances."

17

*Montgomery v. City of Montgomery*, 732 So. 2d 305, 310 (Ala. Civ. App. 1999) (citations and quotation marks omitted). Discretionary function immunity applies unless the officer's conduct is "so egregious as to amount to willful or malicious conduct or conduct engaged in bad faith." *Couch v. City of Sheffield*, 708 So. 2d 144, 153 (Ala. 1998). Again, Cody argues, there is simply no evidence that he acted in such a manner with respect to retrieving the weapon. Thus, he is entitled to immunity, and summary judgment is due to be granted.

Finally, as to the malicious prosecution claim, Cody argues that there is simply no evidence that he assisted in the arrest of Anderson or in the prosecution of Anderson. Cody did not testify at Anderson's trial, and Anderson acknowledged that it was Thompson who obtained the warrants against him. Also, Cody argues, any claim based upon his helping secure the scene and retrieve the weapon would be defeated by discretionary function immunity.[5]

## CONCLUSIONS OF THE COURT

In *Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001), the court made the following observations regarding qualified immunity:

> A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the "preexisting law dictates, that is, truly compel[s]," the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances.
>
> When looking at the preexisting case law, courts, dealing with qualified immunity defenses, must always keep in mind the great distinction between following a precedent and extending a precedent. Two sets of circumstances may be "nearly" the same, but "nearly" can make a great legal difference at the edge. Because fair and clear notice to government officials is the cornerstone of qualified immunity, courts must diligently analyze the preexisting case law to determine whether it really did provide plain notice to every reasonable government official that the pertinent conduct, in the specific circumstances,

---

[5]Anderson's brief does not address the arguments set forth by Cody. Rather, it appears to be a response to Thompson's and the City's motions only. Cody filed a reply brief making these same observations.

would clearly violate preexisting federal law.

. . .

When the facts of previous precedents are necessary to give clear warning that certain conduct in specific circumstances will violate federal law, we must look at the facts in the precedent and at the facts that confronted the government official in the case before the court. The two sets of facts must be materially similar. For qualified immunity purposes, a preexisting precedent is materially similar to the circumstances facing an official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly-situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. But minor variations in some facts (the precedent lacks an arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different from the preexisting precedents, leaving the law applicable--in the circumstances facing the official--not clearly established when the defendant official acted.

To apply properly this "materially similar" principle, the court, surveying the relevant area of law, must discern the facts that were material to the federal law violation in similar preexisting cases. These facts then must be compared to the facts alleged in the case before the court. If there is an absence of a fact (or the presence of an additional fact) in the case before the court, the court must determine whether that fact might make a difference to any reasonable official who had to determine whether his conduct violated federal law in the circumstances in the immediate case. If the court determines that the variance might make a difference, the precedent--when factual particularity is needed to establish the law--cannot clearly establish the law applicable to the circumstances facing the defendant.

*Id.* at 1030-33 (citations and footnotes omitted). *See also Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)("The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.")(citation omitted); *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999)("The defense

19

embodies an objective reasonable standard, giving a government agent the benefit of the doubt unless his actions were so obviously illegal in the light of then existing law that only an official who was incompetent or who knowingly was violating the law would have committed them."). The court will address each claim in turn.

## I. Claims Against Thompson

### Count One

The court starts with the critical undisputed factor in this case. That is, Thompson was dispatched to investigate a possible neighborhood dispute, he encountered the plaintiff carrying a firearm, he ordered the plaintiff to throw down the firearm, and the plaintiff refused. It is clear that, under the circumstances, Thompson is entitled to, at a minimum, qualified immunity as to any alleged Fourth Amendment claim related to the arrest. Further, the taking of the firearm with the consent of the plaintiff's wife was reasonable under the circumstances. The search of the plaintiff was likewise reasonable. At a minimum, Thompson is entitled to qualified immunity on any claim related to the arrest.

### Count Two

There is not sufficient evidence to support an "invasion of privacy" claim. All of the alleged conduct was the reasonable result of plaintiff's refusal to drop his firearm.

### Count Four

The court agrees that Thompson, at a minimum, is entitled to discretionary immunity. In any event, it appears that, in the state court proceedings, a *prima facie* case was established. Thompson at least had reason to believe that he had probable cause to prosecute the plaintiff.

## II.  Claims Against City of Gadsden

Count One

There is no evidence that the alleged violations stated in Count One resulted from any custom, practice, or policy of the City of Gadsden.  Also see discussion regarding Thompson.

Count Two

There is no evidence of a practice or policy.

Count Three

There is no evidence that the City had been alerted to any specific reason to offer special training in this area.  Again, all resulted from the refusal of plaintiff to drop his firearm.  There is nothing to suggest inadequate training in this regard.

Count Four

For reasons argued by the defendants set out above, the court will dismiss this claim against the City.

## III.  Claims Against Cody

Cody had even a lesser role than Thompson.  He is certainly entitled to qualified immunity.

## IV.  Summary

This is a typical case in which a policeman is dispatched and reports to the scene without full knowledge of the circumstances.  The plaintiff could have remedied the problem by dropping his firearm when told to do so.  Thompson certainly was not incompetent in reacting as he did.  He is clearly entitled to qualified immunity in all possible respects except possibly with regard to a purported claim of using excessive force.  It does not appear to the court, however,

21

that the plaintiff has made a claim regarding the use of excessive force in his complaint or the pretrial order.

The court will dismiss all claims except a possible claim of use of excessive force. That will likely depend upon whether the plaintiff has even made such a claim in his complaint or in the pretrial order. Plaintiff will be given ten (10) days to address this issue. Defendant will have seven (7) days to respond. Plaintiff may reply within seven (7) days.

This _20ᵗʰ_ day of May, 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

22